**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

KEVIN V. BYNG,

                                Plaintiff,

                v.                                                    No. 07-CV-471
                                                                        (GLS/DRH)
JAMES L. CAMPBELL, Sheriff of Albany
County Sheriff's Department; ALBANY
COUNTY SHERIFF'S DEPARTMENT;
CORRECTIONAL MEDICAL SERVICES
INC.; ROBNOWITZ, Doctor; SALZMAN,
Doctor; RICH, R.N.; DEBBIE, R.N.; GLORIA
COOPER, CMS Medical Director; D.
DELONG, C.O. ACSD, Badge # 229; M.
ROSE, C.O. ACSD, Badge #404; and JILL
HARRINGTON, CMS Director of Nursing,

                                Defendants.

_____

**APPEARANCES:**                                **OF COUNSEL:**

KEVIN V. BYNG
Plaintiff Pro Se
Post Office Box 756
Utica, New York 13503

ROBERT P. ROCHE, ESQ.
Attorney for Albany County defendants
36 South Pearl Street
Albany, New York 12207

THUILLEZ, FORD, GOLD, BUTLER & YOUNG, LLP.   KAREN A. BUTLER, ESQ.
Attorney for Correctional Medical defendants   KELLY M. MONROE, ESQ.
20 Corporate Woods Boulevard - 6th Floor        WILLIAM C. FIRTH, ESQ.
Albany, New York 12211

**DAVID R. HOMER**
**U.S. MAGISTRATE JUDGE**

                **REPORT-RECOMMENDATION AND ORDER**[1]

_____

        [1]This matter was referred to the undersigned for report and recommendation
pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

Plaintiff pro se Kevin V. Byng ("Byng") was formerly incarcerated at the Albany County Correctional Facility ("ACCF") in the custody of defendant Albany County Sheriff's Department ("ACSD")  as a pretrial detainee.  Byng brings this action pursuant to Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., § 504 of the Rehabilitation Act ("RA"), and the Civil Rights Act of 1871, 42 U.S.C. § 1983, alleging that defendants, ACSD and Albany three employees of ACSD ("County defendants") as well as the Correctional Medical Services Inc. "CMS") and five of its employees[2] ("CNS defendants") violated his Eighth, Ninth, and Fourteenth Amendment rights.  Second Am. Compl. (Docket No. 16).

Presently pending are motions for summary judgment by both the County defendants (Docket No. 125) and the CMS defendants (Docket No. 112) pursuant to Fed. R. Civ. P. 56.  Byng opposes both motions.  Docket Nos. 173, 187.  Also pending is a motion to strike certain submissions in the County defendants' reply to Byng's opposition.  Docket No. 194.  The County defendants oppose that motion.  Docket No. 195.  For the following reasons, (1) the motion of the CMS defendants should be granted in part and denied in part[3], (2) the

---

[2] Byng has requested that defendants Rich, Debbie, and Harrington, three CMS employees, be withdrawn as defendants.  Docket No. 173 at 2-16, ¶ 2.  The CMS defendants deem this to be a dismissal with prejudice while Byng seeks dismissal without prejudice.  Under Fed. R. Civ. P. 41(a)(1)(A)(ii), a plaintiff may dismiss an action against a defendant where, as here, that defendant has answered, only by stipulation of that defendant.  None of the three defendants have stipulated to dismissal without prejudice and Byng has not agreed to dismissal with prejudice. Accordingly, Byng's purported withdrawal of the action as to these three defendants is ineffective and affords no basis to dismiss the action as to those defendants.  Dismissal on this ground should be denied.

[3] In the reply of the CMS defendants, they assert that because Byng exceeded the total number of pages allowed for his memorandum of law, the additional pages which were submitted should be disregarded.  Docket No. 174-2 at 7-8.  Given Byng's *pro se* status, the failure to comply with the page limitation in the local rules is excused in this instance only.

County defendants' motion should be granted in part and denied in part, and (3) Byng's motion is denied.

## I. Background

The facts are related herein in the light most favorable to Byng as the non-moving party.  See subsection II(A) infra.  Byng was held at ACCF in pretrial detention from January 30 to June 12, 2007 when he was transferred to state custody.  Second Am. Compl. ¶ 2. Byng's seven causes of action concern events occurring during his incarceration at ACCF.

## A. Medical Treatment

In November 2004, Byng learned that he had acquired Hepatitis C.  Byng Dep. (Docket No. 112-8) at 13.  While incarcerated in 2005, Byng received over forty weeks of hepatitis treatment but did not receive the entire course of the drug therapy.  See generally Docket No. 112, Ex. F; see also Docket Nos. 112-10 & 11 at 27-53, 108-12; Docket No. 112-11 at 118, 120-21 (over sixty-give ambulatory health entries documenting Byng's injections, side effects, mood, and refusals); Docket No. 112, Ex. F at 113-35 (detailing the daily administration of hepatitis drug therapy); Byng Dep. at 15-16.

In the Fall of 2006, prior to his incarceration at ACCF, Byng briefly treated with Dr. Richter, a gastroenterologist.  Docket No. 112, Ex. E at 12-13; Docket No. 173 at 56-2A; Docket No. 173 at SE 56-91A-B.  During a November 2006 appointment, the prior drug therapy was deemed successful in decreasing Byng's viral load, Byng had remained free of drug and alcohol abuse since January 2004, but treatment with Interferon and Ribavirin "is not at this time a current recommendation . . . surveillance . . . and ultrasound once a year

3

and [liver functions tests] and [blood work] every six months comprises the current recommendations."  Docket No. 112, Ex. E at 12; Docket No. 173 at SE 56-91A.  Byng agreed to this treatment plan.  Docket No. 112, Ex. E at 13; Docket No. 173 at SE 56-91B; but see Byng Dep. at 23-25 (testifying that he did not have a complete recollection of the encounter or the entire conversation and what the actual recommendation was from the physician).

On January 20, 2007, just prior to his reincarceration in ACCF, Byng was hospitalized for complaints of sore throat, wheezing, and shortness of breath.  Docket No. 173 at SE 56-95D.  Byng noted a history of alcohol abuse to the staff.  Id. at 95D6.  Ten days later, when Byng arrived at ACCF, Byng reported that he drank a six-pack of beer per day, his last drink being at 10 a.m. that morning, and that he uses cocaine.  Docket No. 112, Ex. E at 34;[4] Byng Dep. at 19-20, 28 (detailing a two-week relapse where alcohol and cocaine when utilized on multiple occasions).

On January 31, 2007, Byng complained of difficulty breathing.  Docket No. 112, Ex. E at 38; Docket No. 173 at 56-3A.  While Byng's lungs were clear, he was placed on the list for evaluation.  Docket No. 112, Ex. E at 38; Docket No. 173 at 56-3A.  On February 2, 2007, when Dr. Salzman, a defendant, attempted to see Byng, Byng was unavailable as he was appearing in court.  Docket No. 112, Ex. E at 38; Docket No. 173 at 56-3A; Byng Dep. at 30-31; Salzman Aff. (Docket No. 112-14) ¶ 10.  Later that day, Byng again requested

---

[4] Byng's addiction to drugs and alcohol was regularly noted in his psychiatric records as well, which identifies polysubstance abuse as one of his major diagnoses and addiction as a basis for treatment.  See Docket No. 173, SE 56-97 (progress notes outlining diagnosis); Docket No. 112, Ex. F at 170-74, 181-85 (admission screening records for state incarceration outlining multiple diagnoses, including addiction); Docket No. 187-8 at 33 (letter outlining mental health treatment Byng had received since May 12, 2009, including that for addiction); Docket No. 187-8 at 36 (same).

4

treatment for stomach and chest pains.  Docket No. 112, Ex. E at 59.  On February 5, 2007,

Byng was seen by Dr. Salzman who noted Byng's previous Hepatitis C conditions and

neutropenia[5] as well as the fact that his prior drug therapy was deemed ineffective.  Docket

No. 173 at 56-3H; Salzman Aff. ¶ 12.  Byng also provided more of his medical history

including anxiety, insomnia, anorexia, and blurry vision.  Salzman Aff. ¶ 12.

On February 7, 2007, Byng again requested treatment for his liver disease and pain

as well as to see an optometrist.  Docket No. 112, Ex. E at 60.  The following day, Byng was

told that he was on the list for an infectious disease ("ID") consultation.  Id.  Byng was found

to be doing well.  Id. at 38; Docket No. 173 at 56-3A. On February 9, 2007, Dr. Salzman

evaluated Byng and wrote him a prescription.[6]  Docket No. 112, Ex. E at 38.

On February 12, 2007, Byng was examined by ID physician Dr. Rabinowitz, a

defendant herein.[7]  Docket No. 112, Ex. E at 73-74; Docket No. 173 at 56-9T, B; Byng Dep.

at 33.  Rabinowitz ordered blood tests to assess Byng's liver function.  Salzman Aff. ¶ 17.

Rabinowitz's notes outlined a history of (1) substance abuse per the recent emergency

room records,[8] (2) Hepatitis C for which treatment was initiated but proved unsuccessful,[9]

---

[5] Neutropenia occurs when blood marrow is suppressed and can result in a marked decreased in the body's immunities and ability to fight against infection.  Rabinowitz Aff. (Docket No. 112-13)  ¶ ¶ 30, 32.

[6] Byng was regularly provided both Tylenol and Ibuprofen throughout his incarceration at ACCF.  Docket No. 112, Ex. E at 85-90; Docket No. 173 at 56-4 B-C.

[7] This defendant's name is spelled "Robnowitz" in the caption as it is spelled in the original complaint.  Compl. (Docket No. 1).  The name is spelled "Robinowitz" in the Second Amended Complaint.  The correct spelling is "Rabinowitz."  See Rabinowitz Aff. (Docket No. 112-13) 1.  The correct spelling will be utilized herein.

[8] "A six-month abstinence (at least) from alcohol and drug use is imperative in patients with a substance abuse history prior to starting therapy."  Rabinowitz Aff. ¶ 29. Byng acknowledged that immediately prior to his incarceration, he used both alcohol and

and (3) neutropenia aggravated by the Hepatitis treatments.  Docket No. 112, Ex. E at 73;

Docket No. 173 at 56-9B.  Byng also reported that he had completed approximately forty-

five weeks of hepatitis drug therapy.  Docket No. 112, Ex. E at 73; Docket No. 173 at 56-9B.

Byng was scheduled for a further visit.  Docket No. 112, Ex. E at 74; Docket No. 173 at 56-9B.

    On February 14, 2007, Byng sought treatment from the optometrist, claiming that the

optometrist previously informed Byng that he could not receive glasses "unless [he had] a

life threatening illness." Docket No. 112, Ex. E at 61.  Byng had last seen an optometrist on

February 8.  Id.  On February 16, Byng submitted another treatment request, this time for

his neutropenia.  Docket Nos. 173 at 56-10 B & T; 56-75AA.  On February 17, 2007, a

_____

cocaine.  Id.  ¶ 56. "Alcohol intake, even in small quantities, will typically render . . .
therapy useless."  Mendell Aff. (Docket No. 112-12) ¶ 11; see also CMS Chronic Hepatitis
Pathway (Docket No. 112-19) at 17-18, 20, 29-30 (hereinafter "CMS Policy") (instructing
patients that they are prohibited from drinking alcohol for the remainder of their life as high
levels of alcohol consumption expedite the disease progression and stating that
abstinence must be achieved prior to treatment to optimize its effectiveness); Docket No.
173 at SE56-85D (citing National Institute of Health Consensus Statement which provides
that "treatment of patients who are drinking significant amounts of alcohol or who are
actively using illicit drugs should be delayed until these habits are discontinued for at least
6 months . . . .  Treatment for addiction should be provided prior to treatment for hepatitis
C.").

    [9] "In 2005, the standard for treatment [of Hepatitis C] was the use of combination
therapy using two medications, Ribavirin . . . and Peginterferon . . . ."  Rabinowitz Aff. ¶ 21.
Such therapy carries serious side effects, including mental health illnesses, suppressed
bone marrow and decreased white blood cell and platelet production, organ failure, and
death; therefore, "[t]herapy is . . . used with caution.  Id. ¶ ¶ 26-28, 30-36; see also CMS
Policy at 26, 28-30 (outlining side effects of treatment).  Additionally, medical evidence
indicates that "[i]f therapy fails or the virus returns (relapses), it is very unlikely to respond
to another round of treatment.  In addition, there is no generally accepted treatment for
relapse, nor is there an . . . approved therapy."  Mendell Aff. ¶ 10; see also CMS Policy at
17 (explaining that "[c]urrent drug treatment options for chronic hepatitis C are moderately
effective.  Newer medications should be available in the future that will improve treatment
options.")

physician ordered blood tests and wrote a prescription for ibuprofen.  Docket No. 112, Ex. E at 44; Docket No. 173 at 56-3D; Salzman Aff. ¶ 20.

On February 22, 2007, blood tests revealed that Byng's viral load had drastically increased, other critical measures were elevated, and his white blood cell count had decreased.  Docket Nos. 173 at 56-12 A & C; SE 56-85 A & B; Byng Dep. at 35.  Three days later, Byng requested treatment for a cough, trouble breathing, and a fever.  Docket No. 112, Ex. E at 63.  Examination revealed that his lungs were clear and his temperature was slightly elevated.  Id.; Salzman Aff. ¶ 22.  Cold medicine was ordered.  Salzman Aff. ¶ 12.

On February 27, 2007, Byng requested medical attention after he fell coming out of the shower, injuring his nose.  Docket No. 112, Ex. E at 62; Byng Dep. at 35-36.  Byng was examined by a physician's assistant and was given antibiotics and a cream for his injured nose.  Docket No. 112, Ex. E at 44, 62; Salzman Aff. ¶ ¶ 23-26; see also Byng Dep. at 36 (testifying that his treatment was "good").[10]  On March 1, Byng was seen by an optometrist and provided a prescription for bifocals.  Docket No. 112, Ex. E at 79-80; Docket No. 173 at 56-66D.  On March 14, 2007, Byng requested new lenses for his bifocals because vision was blurry out of one lens.  Docket No. 112, Ex. E at 67.  Byng was placed on the schedule for optometry, was evaluated less than one month later, and was provided with new glasses.  Id. at 67, 70-71; Docket No. 173 at 56-3F; Byng Dep. at 31-32.

On March 11, 2007, Byng again requested treatment for his liver and sought health shakes because he was losing weight.  Docket No. 112, Ex. E at 66; Docket No. 173 at 56-

---

[10] Byng contends that the fall was a result of migraine headaches and dizziness which occurred sporadically and for which he never received treatment.  Byng Dep. at 85-86.

13 C1; Salzman Aff. ¶ 32.  Health shakes were denied as not indicated since Byng had gained eleven pounds since his admission to ACCF.  Docket No. 112, Ex. E at 66; Docket No. 173 at 56-13 C1; Salzman Aff. ¶ 33.  However, Dr. Salzman ordered Byng's weight be recorded weekly for three weeks and then monthly for three months.  Docket No. 173 at 56-3F; Salzman Aff. ¶ 34.  Dr. Salzman received a complaint from Byng on March 18, regarding his weight, pain, and hepatitis.  Docket No. 112, Ex. E at 56-58; Docket No. 173 at 56-14 T & B; Salzman Aff. ¶ 37.

From March 24 until April 17, Byng made five requests for treatment for pain in his feet,[11] treatment for his hepatitis, pain, and scratched nose, medicine for his sore throat, and assistance repairing his broken glasses.  Docket No. 112, Ex. E at 51-55; Docket Nos. 173 at 56-15; 56-16; 56-17; 56-20.  On April 15, Dr. Salzman examined Byng, who was still requesting retreatment for his hepatitis.  Salzman Aff. ¶ 47.  Byng had normal vital signs and Dr. Salzman requested another consultation with Dr. Rabinowitz.  Id.

On April 18, Byng was again evaluated by Dr. Rabinowitz.  Docket No. 112, Ex. E at 21, 75-76; Docket No. 173 at 56-30.  Dr. Rabinowitz noted Byng's complaint of right flank and upper quadrant pain.  Docket No. 112, Ex. E at 75; Docket No. 173 at 56-30A.  The pain Byng was complaining of was inconsistent with the hepatitis process; however, pain from hepatitis is not uncommon.  Docket No. 112, Ex. E at  75-76; Docket No. 173 at 56-30; Rabinowitz Aff. ¶ ¶ 46-47.  Therefore, he recommended a higher dose of pain medication to

---

[11] Byng was seen by medical staff on March 25, 2007 regarding his sneaker request.  Salzman Aff. ¶ 40.  Additionally, pain relievers were provided to Byng, by Salzman, to alleviate the pain he was allegedly experiencing in his feet and ankles.  Id. ¶ 41.

alleviate Byng's discomfort.  Docket No. 112, Ex. E at 76; Docket No. 173 at 56-30B.[12]

Additionally, Dr. Rabinowitz noted that Byng did not require health shakes and that any

further retreatment for the Hepatitis C would be contraindicated because of Byng's history of

alcoholism and substance abuse.  Docket No. 112, Ex. E at 76; Docket No. 173 at 56-30B;

see also Rabinowitz Aff. (Docket No. 112-13) ¶ 65 ("After careful assessment . . . including

Mr. Byng's history, treatment, complications including neutropenia, recent drug and alcohol

use and based upon standards of medical care in 2007 . . . I determined Mr. Byng was not

a candidate for retreatment . . . ."); see also CMS Policy at 21 (discouraging treatment for

"pre-trial and nonsentenced federal detainees . . . [because t]he potential for interrupted

antiviral therapy . . . places the inmates at risk for a number of undesirable outcomes,

including treatment failure . . . and adverse effects from medications . . . .").[13]

Beginning on April 19, 2007, Byng sent grievances to numerous individuals

concerning the medical care he was receiving for his hepatitis and pain.  See Docket No.

173 at 56-23 (grievance to defendant Cooper dated April 17, 2007); Docket No. 112, Ex. E

at 4, 17, 18, 24, 26 (complaint dated April 19, 2007 to Sheriff Campbell); Docket No. 173 at

56-27 (same); Docket No. 112, Ex. E at 25 (informal oral grievance dated April 28, 2007 to

Campbell); Docket No. 173 at 56-28 (same); Docket No. 112, Ex. E at 46-48 (letters of

complaint dated April 28 and 29 to Dr. Rabinowitz); id. at 30 (grievance to unnamed third

party checking status of April 23 grievance); Docket No. 173 at 56-32 (same); Docket No.

---

[12] Byng continually asserts that the pain relievers he was provided were ineffective and that he disagreed with the physicians' judgment in prescribing them, suggesting that he should have received a narcotic or other more potent medication.  Byng Dep. at 41.

[13] Byng claims that he was denied treatment due to an unconstitutional policy of saving money, about which he was advised by five ACCF employees who remain anonymous.  See e.g. Docket No. 187-2 ¶ 28; Docket No. 187-3 ¶¶ 43(b), 44(b).

112, Ex. E at 3 (grievance to New York State Commission of Corrections dated May 3, 2007); Docket No. 173 at 56-34, 56-66B (same); Byng Dep. at 60-71 (detailing official grievances and informal letters of complaint sent during incarceration).  The New York State Commission of Corrections initiated an investigation and concluded that Byng was receiving appropriate care and that the bulk of his complaints involved a disagreement with the treatment he was receiving, and the Commission deferred to the medical judgment and recommendations.  Docket No. 112, Ex. E at 14-16; Docket No. 173 at 56-39; Docket No. 173 at SE56-92.  After the decision was announced, Byng grieved the outcome in a letter dated May 15, 2007, to an unnamed third party.  Docket No. 173 at 56-41 A-C.; see also Id. at 56-60 (additional correspondence dated June 21, 2007 seeking outcome of Commission decision from May 10).

On June 12, 2007, Byng was transferred to state custody at Downstate Correctional Facility.[14]  Docket No. 112, Ex. F at 4.  Byng continued to complain of right upper quadrant pain.  Id. at 5-6.  On August 31, 2007, Byng first reported a small lump on his abdomen which was still accompanied by right upper quadrant pain.  Id. at 7.  On December 1, 2007, possible signs of a hernia were observed and a hernia was diagnosed on January 3, 2008.  Id. at 11; Docket No. 173 at 56-71D.  The hernia was repaired on March 7, 2009.  Docket No. 173 at 56-72; Byng Dep. at 10.

Additionally, after Byng was transferred from ACCF, he continued to seek retreatment for his hepatitis.  Retreatment was denied on November 2, 2007 at Fishkill.  Docket No. 112, Ex. F at 9.  However, as of the Fall of 2008, it appeared that retreatment

---

[14] Byng has not named any individuals as defendants in the present litigation who provided him medical treatment while he was at Downstate.

might be possible.  Docket No. 173 at 56-77A.  One reason why the initial treatment in 2005 was interrupted was Byng's neutropenia.  Id. at 56-77B.  After the ID consult, an unnamed, third party corrections commissioner commented that prior treatment was not ultimately successful, Byng's viral load had increased substantially, but Byng retained normal liver function which could be monitored unless the levels began to elevate in which case retreatment would be considered, hopefully with a more effective therapy than that which is currently available.  Id. at 56-77B-C.

On December 4, 2008, Byng received correspondence from a liver specialist at St. Luke's Hospital in Utica recommending that Byng be retreated with drug therapy for his hepatits.  Docket No. 173 at SE 56-85E1.  This correspondence also indicated that another physician agreed with the recommendation.  Id.  The correspondence also advised that the "laboratory data suggest[ed] that [his] hepatitis C virus did damage [Byng's] liver, putting it on a quite rapid pathway towards cirrhosis, which is the worst degree of liver damage . . . [and i]f there is a good time to treat, it is now.  Abusing various chemical substances will not necessarily disqualify you from treatment . . . ." but continued alcohol abuse contributes to liver damage and continued substance abuse puts you at risk for developing new infections and viruses.  Docket No. 173 at SE56-85G.

### B. Excessive Force

Byng contends that on May 23, 2007, he was assaulted by defendants Rose and Delong.  Shortly before the incident, Byng filed a grievance against CMS for failure to provide appropriate medical care, and alleges that he became the object of verbal harassment by Rose and Delong for complaining about his care.  Byng Dep. at 46-48.

11

Byng contends that on the evening of May 23, medical staff gave him his medication in a crushed form and, when he asked what the powder was, he discovered that the medical staff had almost given him the incorrect medication.  Docket No. 187-3, ¶ 49 (P1).[15]  After receiving the correct medication, Byng made a remark to Delong asking whether he would ever believe Byng and cease harassing him.  Id.  The gate to Byng's tier was opened[16] and Delong entered, with Rose and others, and slammed Byng's right hand into the gate and elbowed Byng in the back by his right kidney. Docket No. 187-3, ¶ 54(c); Docket No. 187-7 at 66-67, ¶ 8,.

Byng was then brought to the officer's desk at Rose's direction, where his face was pushed into the steel control box and Delong "slammed his knuckled fist down . . . hard on top of [Byng's] head."  Docket No. 187-3, ¶ 54 (e); Docket No. 187-7 at 66-67, ¶ 8.  Byng was then elbowed under his right eye, verbally threatened, and then pushed back into the vestibule.  Docket No. 187-3, ¶ 54 (f)-(g).  Byng was then escorted off the tier. .  Docket No. 187-3, ¶ 57, 59 (2)-(3); see also Harris Aff. (Docket No. 187-7 at 60-63) ¶¶ 6, 8, 18-19, 23-24, 26-29.[17]  When Sgt. Frambach arrived, Byng was alone.  Frambach Aff. (Docket No.

_____

[15] Byng's mental health medications were delivered in a crushed form because of a prior instance in which he hid his medication in his cheek, refusing to take it.  Docket No. 173 at SE56-86 B; Byng Dep. at 75-79 (admitting that on one occasion Byng hid his medication in his mouth to avoid taking it)

[16] According to facility procedure, the gate was locked when medication was being dispensed and inmates reached through the bars to take their cups of medication from a cart located on the other side of the locked gate.  Docket No. 187-7 at 65, ¶ 4; Harris Aff. ¶¶ 5-6.  Accordingly, the inmates were prevented from having any physical contact with the medical staff or corrections officers who escorted them.

[17]According to Delong, no altercation occurred.  Delong escorted medical staff on rounds during the night in question.  Delong Aff. (Docket No. 125-3) ¶ 4.  Byng was loud, aggressive, vulgar, and belligerent, berating the nurse for providing the wrong medication in the wrong form.  Id.  ¶ 5.  Delong "stepped between [] Byng and the nurse, and told him

125-4) ¶ 3.  Frambach ordered Byng to pack and leave the tier and Byng complied.  Id. ¶ 4.

Later that evening, Byng wrote a letter to non-party Wigger, complaining of the events of May 23, 2007.  Wigger Aff. (Docket No. 125-2 at 1-3) ¶ 2; Docket No. 125-2 at 6.  A second letter was also sent to Wigger naming Rose and Delong as the assailants and reporting their refusal to provide him with a grievance form.  Docket No. 173 at 56-47.  Byng was charged with a disciplinary violation for which he eventually agreed to fifteen days of cell confinement.  Wigger Aff. ¶ 6; see also Docket No. 173 at 56-51 (inmate disciplinary report form charging Byng with belligerence to medical staff).  On May 24, 2007, in a letter to Frambach, Byng officially made a statement which indicated that he did "not want to file a grievance or sign any statement against any officer," explained what his version of the events of the evening were, and sought expungement of the disciplinary charge.  Docket No. 125-2 at 22; Docket No. 173 at 56-53.  After receiving the charge, Byng wrote a second letter to Frambach dated May 24 stating that he received a wrongful disciplinary charge based on retaliatory motives, he had been harassed and threatened by Delong and Rose, and his previous use of neutral language, such as "restrained", was solely because he was afraid he would suffer more retaliation if he exposed the truth.  Docket No. 173 at 56-54 A-B.

On May 24, 2007, Byng requested medical attention after the assault.  Docket No.

---

to consume his meds as they had been given to him . . . He became irate, waving his arms and shouting and calling [Delong] names."  Id. ¶ 7.  Delong was unable to restore order, so he called Sgt. Frambach to the tier to escort Byng elsewhere.  Id. ¶¶ 9-10.  Delong's version of the evening was corroborated by the inmates in adjoining cells who claimed that they never heard or saw anything resembling a physical altercation (Docket No. 125-2 at 8-12; Docket No. 187-7 at 46-49) and the nurse who attested to Byng's non-compliance, anger, and aggressiveness, and the lack of any violence (Docket No. 125-2 at 14; Docket No. 187-7 at 50).  Rose supported Delong's assertions that Byng became belligerent and that no one assaulted Byng.  Rose Aff. (Docket No. 125-5).

112, Ex. E at 50; Docket No. 173 at 56-55.  Later that evening, Byng was evaluated.

Docket No. 125-2 at 20; Docket No. 112, Ex. E at 35; Docket No. 173 at 56-49.  Byng

complained of right hand pain and swelling but retained full range of motion and a normal

grasp.  Docket No. 125-2 at 20; Docket No. 112, Ex. E at 35; Docket No. 173 at 56-49.

Additionally, Byng alleged pain and tenderness in his right flank, but there was no visible

swelling.  Docket No. 125-2 at 20; Docket No. 112, Ex. E at 35; Docket No. 173 at 56-49.

Byng also alleged that he was thrown head first into metal objects but, although his right eye

was swollen, his eye glasses were undamaged.  Docket No. 125-2 at 20; Docket No. 112,

Ex. E at 35; Docket No. 173 at 56-49.  X-rays were ordered for Byng's face, hand, and

flank, and it was noted that he walked normally and without assistance, was provided with

Tylenol, and sent back to his cell.  Docket No. 125-2 at 20; Docket No. 112, Ex. E at 35;

Docket No. 173 at 56-49.

Radiology reports were returned on May 29, 2007.  Docket No. 112, Ex. E at 68;

Docket No. 173 at 56-50.  The reports for the ribs and hands were negative with no

evidence of fracture or osteoporosis.  Docket No. 112, Ex. E at 68; Docket No. 173 at 56-

50.  The facial bones showed no evidence of fracture or dislocation.  Docket No. 112, Ex. E

at 68; Docket No. 173 at 56-50.  Photographs were taken of Byng, although he complained

that the documentation was inadequate as there were no photographs taken of his bruised

back.  Docket No. 173, at 56-57 B-C.  On June 10, 2009, a CT scan of Byng's head was

completed showing two low dense lesions in his brain consistent with old conditions.

Docket No. 173 at 56-110 A.

14

## II.  Discussion

Liberally construing Byng's Second Amended Complaint, he alleges that medical treatment was withheld and that he was assaulted in retaliation for filing grievances against CMS.  Additionally, Byng claims that the CMS defendants were deliberately indifferent to his serious medical needs and that the County defendants used excessive force against him on May 23, 2007 in violation of his Fourteenth Amendment rights.  Byng also claims that the CMS defendants released his confidential medical records without his consent to the attorneys representing both the CMS and County defendants.  Finally, Byng claims that the denial of drug therapy for his Hepatitis C constituted a violation of the ADA.

The CMS defendants assert that Byng's Fourteenth Amendment claims of deliberate indifference are meritless, Byng waived any right of privacy or confidentiality he possessed in his medical records by filing the instant law suit, Byng's ADA claims are also meritless, and Byng has failed to exhaust his administrative remedies.  The County defendants also assert that Byng has failed to exhaust his administrative remedies and that his Fourteenth Amendment claims of excessive force are meritless.

## A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Facts are material if they may affect the outcome of the

case as determined by substantive law.  Anderson v. Liberty Lobby, 477 U.S. 242, 248

(1986).  All ambiguities are resolved and all reasonable inferences are drawn in favor of the

non-moving party. Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing that there is a genuine

issue for trial. The non-moving party must do more than merely show that there is some

doubt or speculation as to the true nature of the facts.  Matsushita Elec. Indus. Co. v. Zenith

Radio Corp., 475 U.S. 574, 586 (1986).  It must be apparent that no rational finder of fact

could find in favor of the non-moving party for a court to grant a motion for summary

judgment.  Gallo v. Prudential Residential Servs. 22 F.3d 1219, 1223-24 (2d Cir. 1994);

Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).

When, as here, a party seeks summary judgment against a pro se litigant, a court

must afford the non-movant special solicitude.  Triestman v. Fed. Bureau of Prisons, 470

F.3d 471, 477 (2d Cir. 2006); see also Sealed Plaintiff v. Sealed Defendant #1, 537 F.3d

185, 191-92 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded

district courts that 'when [a] plaintiff proceeds pro se, ... a court is obliged to construe his

pleadings liberally.'" (citations omitted))..  However, the mere existence of some alleged

factual dispute between the parties will not defeat an otherwise properly supported motion

for summary judgment; the requirement is that there be no genuine issue of material fact.

Anderson, 477 U.S. at 247-48.


**B. Exhaustion**

As a threshold matter, defendants contend that Byng has failed to exhaust his

administrative remedies.  Under 42 U.S.C. § 1997e(a), an inmate must exhaust all

administrative remedies prior to bringing any suits challenging prison conditions, including

federal civil rights cases.  Porter v. Nussle, 534 U.S. 516, 524 (2002); see also Woodford v.

Ngo, 126 S. Ct. 2378, 2382-83 (2006).  This exhaustion requirement applies to all prison

condition claims.  Porter, 534 U.S. at 532.  "[A]ny deprivation that does not affect the fact or

duration of a prisoner's overall confinement is necessarily a condition of that confinement."

Jenkins v. Haubert, 179 F.3d 19, 28 (2d Cir. 1999). The exhaustion requirement also

applies even if the administrative grievance process does not provide for all the relief

requested by the inmate.  Nussle, 534 U.S. at 524.

    While the Supreme Court has deemed exhaustion mandatory, the Second Circuit

has recognized that "certain caveats apply."  Ruggiero v. County of Orange, 467 F.3d 170,

175 (2d Cir. 2006) (citing Giano v. Goord, 380 F.3d 670, 677 (2d Cir. 2004)). A court must

conduct a three-part inquiry to determine if an inmate's failure to folow the applicable

grievance procedures is fatal to his or her claims.  A court must consider whether

> (1) administrative remedies are not available to the prisoner; (2)
> defendants have either waived the defense of failure to exhaust
> or acted in such a way as to estop them from raising the
> defense; or (3) special circumstances, such as a reasonable
> misunderstanding of the grievance procedures, justify the
> prisoner's failure to comply with the exhaustion requirement.

Ruggiero, 467 F.3d at 175 (citing Hemphill v. New York, 380 F.3d 680, 686 (2d Cir. 2004)).

    Administrative remedies are unavailable when there is no "possibility of [] relief for

the action complained of."  Abney v. McGinnis, 380 F.3d 663, 667 (2d Cir. 2004) (citing

Booth v. Churner, 532 U.S. 731, 738 (2001)).  The test to determine the availability of an

administrative remedy is an objective one asking whether "a similarly situated individual of

ordinary firmness" would have deemed it accessible.  Id. at 688.  Courts have found

17

unavailability "where plaintiff is unaware of the grievance procedures or did not understand it or where defendants' behavior prevents plaintiff from seeking administrative remedies." Hargrove v. Riley, No. CV-04-4587 (DST), 2007 WL 389003, at *8 (E.D.N.Y. 2007) (internal citations omitted).

The ACCF maintained a three-step procedure for inmates to file grievances concerning the conditions of their confinement. ACCF Rules & Regs. (Docket No. 125-8) at 22 (handbook given to inmates upon admission). First, an inmate must file a grievance with the Grievance Coordinator. Id. If dissatisfied with the Coordinator's determination, an inmate may then appeal to a Chief Administrative Officer within the facility. Id. If still dissatisfied, an inmate may then appeal to the state Commission on Corrections. Id. This procedure required that a grievance be filed in writing on a particular form to be provided to an inmate by the unit supervisor upon request of the inmate. Id.

Byng contends that his efforts to pursue administrative remedies here were impeded by defendants' failures to provide him with the inmate handbook describing the grievance procedure and the necessary grievance form. Viewing the facts in the light most favorable to Byng, defendants' failures, if proven, would constitute behavior excusing Byng's failure to exhaust. Docket No. 187-2, ¶ 13 (b); Docket No. 187-3, ¶ 11. The necessity for Byng to file his grievances on the form designated by ACCF is underscored by the ACCF inmate handbook. See ACCF Rules & Regs. at 22. Thus, if proven, defendants' failure to provide either the facility rules and regulations or the necessary form when requested by Byng reasonably prevented compliance with the procedures. Id. Repeated failures by defendants to provide inmates with the facility rules to apprise them of grievance procedures and failure to provide inmates with the form when requested would deter a

similarly situated individual from attempting to pursue a grievance.  See Harris Aff. ¶ 30

(stating that he also did not receive the ACCF rules upon his entrance into the facility).

Assuming their truth for purposes of this motion, Byng's assertions suffice to raise

material questions of fact as to whether Byng received the inmate handbook or the

requested form.  These questions of fact defeat defendants' motions on this ground.

Accordingly, defendants' motions on this ground should be denied.


### C. Retaliation

Byng contends that the CMS defendants failed to provide him with drug therapy for

his hepatitis and that the County defendants assaulted him, both in retaliation for the

grievances that he filed against CMS.  To state an actionable claim for retaliation, a plaintiff

must first allege that the plaintiff's conduct was constitutionally protected and that this

protected conduct was a substantial factor that caused the adverse action against plaintiff.

Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996).  "Under this analysis, adverse action

taken for both proper and improper reasons may be upheld if the action would have been

taken based on the proper reasons alone."  Jackson v. Onondaga County, 549 F. Supp. 2d

204, 215 (N.D.N.Y. 2008) (citing Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996)).

Additionally, courts must view retaliation claims with care and skepticism to avoid judicial

intrusion into prison administration matters. Id.  Conclusory allegations alone are

insufficient.  Id. (citing Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir. 1983) (explaining that

"claim[s] supported by specific and detailed factual allegations . . . ought usually be pursued

with full discovery.")).

In this case, Byng has failed to allege facts sufficient to support a retaliation claim.

19

Byng's actions in filing grievances constitutes an activity protected by the First Amendment. However, with respect to the CMS defendants, Byng has failed to show that he was subject to deliberate indifference or intentional delay of any medical treatment.  As such, he has failed to prove any adverse action caused by the CMS defendants which he suffered. Moreover, to the extent that Byng's contentions can be construed as proof of an adverse action, Byng has made only conclusory allegations to demonstrate that the filing of his grievances was a substantial factor in any CMS defendant's decisions on treatment.  These conclusory allegations, without more, are insufficient to maintain the present claims.  Id. With respect to the County defendants, Byng alleges no facts other than conclusory allegations to demonstrate that the filing of his grievance against CMS was a substantial factor in the May 23 assault.  As previously stated, these conclusory allegations, without more, are insufficient to maintain the present claims.  Id.

Accordingly, Byng has failed to present sufficient evidence to withstand a motion for summary judgment on his retaliation claims and defendants' motions as to those claims should be granted.

### D. Personal Involvement

Defendants contend that Byng has failed to establish the personal involvement of Sheriff Campbell or of CMS.  "'[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'"  Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)).  Thus, supervisory officials may not be held liable merely because they held a position of authority.  Id.; Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996).

20

However, supervisory personnel may be considered "personally involved" if:

> (1) [T]he defendant participated directly in the alleged constitutional violation;
>
> (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;
>
> (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;
>
> (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or
>
> (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir. 1986)).


### 1. Campbell

Campbell was the Albany County Sheriff during the period of Byng's detention at the ACCF.  Campbell Aff. (Docket No. 191-3) ¶ 1.  Campbell's responsibilities included the management and operation of the ACCF.  Id.  Byng does not contend that Campbell was directly involved in any of the constitutional violations but that by virtue of Campbell's position and a letter of complaint sent to Campbell, Campbell was personally involved.  To the extent that Byng claims that his grievances involved Campbell, those contentions are misplaced.

First, grievances alone will not suffice to sustain a claim for personal involvement. See Garrido v. Coughlin, 716 F. Supp. 98,  100 (S.D.N.Y.1989) (holding that Commissioner

of DOCS not personally liable for ignoring plaintiff's letter of protest and request for an investigation).   Thus, even construing the amended complaint in the light most favorable to Byng, any allegations of personal involvement by Campbell still lack any factual basis. Second, even assuming that a letter was filed, received by Campbell, and forwarded on, such actions  would not alone suffice to give notice to Campbell of any deprivation. Additionally, such allegations fail to demonstrate that Campbell actually investigated or became involved in the conduct at issue as all that has been shown is that the letter was forwarded on to others.  See Atkins v. County of Orange, 251 F. Supp. 2d 1225, 1234 (S.D.N.Y. 2003) ("Personal involvement will be found, however, if an official acts on a prisoner's grievances or otherwise responds to them.") (citations omitted).

Finally, to the extent that Byng claims that Campbell instituted health policies, no evidence other than conclusory assertions have been proffered by Byng.  Additionally, Campbell explained without contradiction that "all medical services . . . have been outsourced to an independent corporate entity . . ." since 2002 and that the contractor is responsible for all decisions involving medical treatment.  Campbell Aff. (Docket No. 191-3) ¶ 2.  Thus, Campbell had no power to create or institute any of the medical policies with which Byng disagrees.  Id.  ¶ 6.  Moreover, there is no evidence that Campbell created a hiring or retention policy which allowed constitutional violations to continue or was grossly negligent in managing other defendants.

Accordingly, the County defendants' motion on this ground should be granted as to Campbell.

**2. CMS**

CMS moves for summary judgment based on their lack of personal involvement. CMS Defs. Mem. of Law (Docket No. 112-24) at 9. "Private employers are not liable under § 1983 for the constitutional torts of their employees unless the plaintiff proves that action pursuant to official policy of some nature caused a constitutional tort." Rojas v. Alexander's Dep't Store, Inc., 924 F.2d 406, 408 (2d Cir. 1990) (internal quotation marks and citations omitted). "Such a claim cannot be based on the theory of respondeat superior [and] . . . there must be proof of such a custom or policy in order to permit recovery on claims against individual . . . employees . . . ." Perez v. County of Westchester, 83 F. Supp. 2d 435, 438 (S.D.N.Y. 2000) (citations omitted). Byng asserts that there was a CMS policy in effect denying inmates hepatitis drug therapy because of its cost. As this was a medical decision over which CMS had exclusive jurisdiction, Byng's evidence suffices to raise a question of fact on the personal involvement of CMS. Moreover, Drs. Salzman and Rabinowitz relied upon CMS policies regarding Byng's ineligibility for drug therapy in denying and delaying that therapy for Byng. This evidence provides and additional question of fact as to CMS' personal involvement.

Accordingly, CMS' motion for summary judgment on this ground should be denied.

**E. Fourteenth Amendment**

Byng asserts various of his claims under the Eighth Amendment which explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. Byng was held at the ACCF as a pretrial detainee from January to June, 2007 when he was transferred to state custody following his criminal conviction. Second Am. Compl. ¶2. The

Eighth Amendment protections apply to those who have been convicted of a crime, sentenced, and are thus suffering the "punishment" contemplated by the Cruel and Unusual Punishment Clause.  Benjamin v. Fraser, 343 F.3d 35, 49-50 (2d Cir. 2003) (citing cases). Claims concerning the conditions of confinement brought by a pretrial detainee, such as Byng here, must be analyzed under the Fourteenth Amendment Due Process Clause.  Id.

The standards under the Eighth and Fourteenth Amendments are not identical but are strikingly similar.  For example, claims under the Eighth Amendment require proof of both serious injury to the plaintiff and deliberate indifference to a known danger by the prison official.  See Farmer v. Brennan, 511 U.S. 825, 834-35 (1994).  Claims under the Fourteenth Amendment require proof of actual or imminent harm to the plaintiff and deliberate indifference by the prison official.  See Benjamin, 343 F.3d at 50-51 & n.17; see also Shane v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189, 199-200 (1989) ("[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being . . . [including] food, clothing, shelter, medical care, and reasonable safety . . . .").  Accordingly, cases analyzed under the Eighth Amendment may provide guidance in analyzing cases, as here, considered under the Fourteenth Amendment.

### 1. Medical Care

The Fourteenth Amendment prohibition extends to the provision of medical care. Shane, 489 U.S. at 199-200.  The test for a § 1983 claim is twofold. First, the prisoner must show that the condition to which he was exposed was sufficiently serious.  Farmer, 511 U.S.

at 834; Benjamin, 343 F.3d at 51 n.17.  Second, the prisoner must show that the prison

official demonstrated deliberate indifference by knowing of the risk and failing to take

measures to avoid the harm.  Id.  "[P]rison officials who actually knew of a substantial risk to

inmate health or safety may be found free from liability if they responded reasonably to the

risk, even if the harm ultimately was not averted."  Id. at 844.

"'Because society does not expect that prisoners will have unqualified access to

healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to

state a cognizable claim.  Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003) (quoting

Hudson v. McMillian, 503 U.S. 1,9 (1992)); see also Benjamin, 343 F.3d at 51 n.17.

Because there is no distinct litmus test, a serious medical condition is determined by factors

such as "(1) whether a reasonable doctor or patient would perceive the medical need in

question as 'important and worthy of comment or treatment,' (2) whether the medical

condition significantly affects daily activities, and (3) the existence of chronic and substantial

pain."  Brock v. Wright, 315 F.3d 158, 162-63 (2d Cir. 2003) (citing Chance, 143 F.3d 698,

702 (2d Cir. 1998)).  The severity of the denial of care should also be judged within the

context of the surrounding facts and circumstances of the case.  Smith, 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of

and disregarded the prisoner's serious medical needs."  Chance, 143 F.3d at 702.  Thus,

prison officials must be "intentionally denying or delaying access to medical care or

intentionally interfering with the treatment once prescribed."  Estelle v. Gamble, 429 U.S.

97, 104 (1976).  "Mere disagreement over proper treatment does not create a constitutional

claim" as long as the treatment was adequate.  Chance, 143 F.3d at 703.  Thus,

"disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms

of treatment, or the need for specialists . . . are not adequate grounds for a section 1983 claim." Sonds v. St. Barnabas Hosp. Corr. Health Servs., 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001).

### i. Hepatitis C

Defendants do not contest that Hepatitis constitutes a serious medical condition. CMS Defs. Mem. of Law (Docket No. 112-24) at 5. However, defendants do contend that they were not deliberately indifferent to Byng's medical condition.

Byng alleges that the CMS defendants were deliberately indifferent to his medical needs by failing to provide him with drug therapy for his hepatitis. However, Byng's complaints essentially boil down to a difference of opinion over treatment and such disagreements are insufficient to maintain a constitutional claim. Sonds, 151 F. Supp. 2d at 312. Medical records demonstrate that alcohol and substance abuse diminished the efficacy of treatment, that a six-months of abstinence and sobriety should first be achieved before treatment, and the drug therapy included serious possible side effects such as neutropenia. Rabinowitz Aff. ¶¶ 26-36, 59; CMS Policy at 17-18, 20, 26, 28-30; Docket No. 173 at SE56-85D.

It is undisputed that immediately prior to entering ACCF, Byng relapsed, began using drugs and alcohol, and also had a documented case of neutropenia. Docket No. 112, Ex. E at 73; Docket No. 173 at 56-9B. Moreover, blood tests on February 22, 2007 indicated that Byng's white blood cell counts were low, a condition which would be exacerbated by the drug therapy and leave Byng at risk due to a compromised immune system. Docket Nos. 173 at 56-12 A & C; SE56-85 A & B; Byng Dep. at 35. Dr. Rabinowitz evaluated Byng on

two occasions in two months and, based upon the aforementioned, determined that pain relief was appropriate but retreatment was not.  This decision was based on multiple visits and examinations of Byng as well as a detailed review of Byng's records.  Such extensive involvement refutes any claims of indifference or delay.  Moreover, Byng had already received treatment, relapsed, and no recommended course for retreatment existed, and newer and more effective medication was expected to be available soon.  Mendell Aff. ¶ 10; CMS Policy at 17.  Thus, CMS policy and recommendations from a state commissioner also supported Dr. Rabinowitz's treatment decisions.  Docket No. 173, at 56-77 B-C.

To the extent that Byng contends that his current medical treatment discredits that rendered by the CMS  defendants, such contentions are misplaced.  First, the physicians from St. Luke's Hospital, Byng's current treating sources, recognize the importance of sobriety prior to drug therapy to achieve the best possible outcome.  Docket No. 173, at SE56-85G.  In 2007, Byng had an admitted relapse with drugs and alcohol, and according to all medical advice, his sobriety was essential prior to reconsidering any drug therapy. Deferring such treatment for six months was consistent with policies and opinions on treatment in Byng's circumstances and reasonable given all relevant factors bearing on the decision.  No question of fact has been raised to demonstrate deliberate indifference or delay by any defendant.  Additionally, any differences in treatment between the physicians at St. Luke's Hospital and the CMS defendants do not indicate a constitutional violation but rather, at most, a reasoned difference of opinion.  Chance, 143 F.3d at 703.  As previously discussed, the CMS defendants provided reasonable and adequate treatment to Byng and based on the medical evidence and policies in effect at the time Byng was incarcerated at ACCF.

Accordingly, the CMS defendants' motion for summary judgment as to Byng's Fourteenth Amendment claims of deliberate indifference should be granted as to all such claims and defendants.

### ii. Chronic Pain

Byng also contends that the CMS defendants were deliberately indifferent to his chronic right, upper quadrant pain.  Defendants do not challenge that such pain constituted a serious medical need.  Without deciding that issue, based on the medical evidence submitted, it is clear that the CMS defendants were not deliberately indifferent to Byng's pain.

Byng was examined by Dr. Salzman on multiple occasions for a variety of medical conditions.  Based on Byng's history of hepatitis and neuropenia, Dr. Salzman referred Byng to an ID specialist.  Docket No. 173 at 56-3 H; Salzman Aff. ¶ 12.  In addition, Dr. Salzman attempted to alleviate Byng's pain by prescribing pain relievers on multiple occasions.  Docket No. 112, Ex. E at 38, 44, 85-90; Docket No. 173 at 56-4 B-C.  To the extent that Byng complains that these pain relievers were ineffective and should have been stronger, such statements represent a difference of opinion as to the appropriate medications which is insufficient to prove a deliberate indifference claim.  Sonds, 151 F. Supp. 2d at 312.

Moreover, to the extent that Byng claims that the CMS defendants were deliberately indifferent in failing to diagnose his hernia sooner, such complaints at worst assert negligence which is insufficient to state a constitutional claim.  Byng's specific pain was inconsistent with the hepatitis, but the complaints of generalized pain were consistent with

28

the progression of the disease.  Moreover, Byng did not report a lump in his abdomen, the

best indication of a hernia, until August 2007 and exhibited no signs of a hernia until

December 2007.  Docket No. 112, Ex. F at 7, 11; Docket No. 173 at 56-71D.  The absence

of specific symptoms until the Fall of 2007 supports defendants' decision to treat the

unspecified pain with pain relievers.  If further diagnostic tests should, or could, have been

ordered, such an omission would support a claim of malpractice at worst.  See Estelle , 429

U.S. at 107 ("[W]hether an X-ray . . . is indicated is a classic example of a matter for

medical decision.  A medical decision not to order an X-ray . . . does not represent cruel and

unusual punishment.  At most it is medical malpractice . . . .").  This is still insufficient to

sustain a claim for deliberate indifference.  Id. at 106 ("Medical malpractice does not

become a constitutional violation merely because the victim is a prisoner.")

Accordingly, the motion of the CMS defendants on this ground should be granted in

all respects.[18]

---

[18] If it is construed that Byng claims deliberate indifference as to his weight, scraped nose, blurred vision, or sore feet, such contentions fail to meet the deliberate indifference prong.  Despite Byng's contentions, his weight increased during his incarceration at ACCF, so additional dietary supplements were not indicated.  Docket No. 112, Ex. E at 66; Docket No. 173 at 56-3F, 56-13 C1.  Despite the objective medical evidence indicating a weight problem, Dr. Salzman still ordered that Byng's weight be monitored.  Salzman Aff. ¶ 34.  Other action sought by Byng only represented a difference of opinion over treatment which is insufficient to state a constitutional claim.  Sonds, 151 F. Supp. 2d at 312.  Byng testified that the medical department was good in responding to and treating his nose after he fell.  Byng Dep. at 36.  The following day, antibiotics and cream were given to Byng.  Docket No. 112, Ex. E at 62.  This evidence conclusively contradict any allegations of indifference or delay.  Byng also made multiple trips to the optometrist and received multiple bifocal prescriptions.  Additionally, when Byng complained that his right lens was blurry, another examination and lens were provided.  Docket No. 112, Ex. E at 67, 70-71, 79-80; Byng Dep. at 31-32.  Lastly, Byng was also examined and provided pain medication for his complaints of sore feet.  Salzman Aff. ¶¶ 40-41.  Although Byng was not provided with the sneakers he requested, such a request was deemed unnecessary by medical staff and constitutes a mere difference of opinion over treatment.  Sonds v. St. Barnabas Hosp. Corr. Health Servs., 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001).

29

**2. Excessive Force[19]**

To sustain a claim of excessive force, a pretrial detainee must establish both objective and subjective elements.  Blyden v. Mancusi, 186 F.3d 252, 262 (2d Cir. 1999); see also United States v. Walsh, 194 F.3d 37, 47-48 (2d Cir. 1999) (holding that an excessive force claim by a pretrial detainee must be analyzed under the Fourth rather than the Eighth Amendment, but the standards under the two amendments are identical).  The objective element is "responsive to contemporary standards of decency" and requires a showing that "the injury actually inflicted is sufficiently serious to warrant [constitutional] protection."  Hudson, 503 U.S. at 9 (internal citations omitted); Blyden, 186 F.3d at 262. The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness."  Sims, 230 F.3d at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'"  Id. (quoting Hudson, 503 U.S. at 7).

Byng has sufficiently raised a question of fact as to whether he was the victim of excessive force.  Construing the facts in the light most favorable to him, Byng has offered evidence that Delong struck him without good reason.  Docket No. 173 at 56-110A. Additionally, Byng offers evidence that he was separated at all times from the medical staff by a locked gate, that he could not have contact with the medical staff or the corrections officer escort due to the locked gate, and that there was no danger or reasonable need to

---

[19] To the extent that Byng claims constitutional violations based on alleged verbal harassment by Delong and Rose, such claims must fail.  See Purcell v. Coughlin, 790 F.2d 263, 265 (2d Cir. 1986) (holding that verbal harassment was insufficient to state a cognizable constitutional claim).

30

exert any type of force given the absence of any threat to staff or any inmate.  Docket No.

187-3, ¶ 57, 59 (2)-(3); Docket No. 187-7 at 65, ¶ 4.  Thus, if proven, the actions of Delong

and Rose in opening the gate and entering solely to inflict harm on Byng represent the type

of malicious behavior and bad faith against which the Constitution seeks to protect.  Viewing

the facts in the light most favorable to Byng, then, he has raised a question of fact as to

what occurred on the evening of May 23.

Accordingly, the County defendants' motion for summary judgment on these claims

should be denied.


### 3. Disclosure of Medical Records

Byng claims that his Fourteenth Amendment right to privacy was violated when the

CMS defendants released his medical records to counsel for both the CMS and the County

defendants in this case without his prior consent or written authorization.

Claims surrounding disclosure of confidential medical information are analyzed under

both the Eighth and Fourteenth Amendments.  See generally Rodriguez v. Ames, 287 F.

Supp. 2d 213, 218-21 (S.D.N.Y. 2003).  However, "[a] plaintiff's privacy right in his medical

records is neither fundamental nor absolute."  Barnes v. Glennon, No. 05-CV-153

(LEK/RFT), 2006 WL 2811821, at *3 (N.D.N.Y. Sept. 28, 2006) (citations omitted); see also

Doe v. Marsh, 918 F. Supp. 580, 585 (N.D.N.Y. 1996) ("[I]t also was clear that the privacy

right, at least as it applied to medical information, was not absolute.");  Jarvis v. Wellman,

52 F.3d 125, 126 (6th Cir. 1995) ("[T]he court approved the release of medical records . . .

based upon the legitimate nature of the requests for information.  The district court inferred

from this approach that a non-legitimate release of confidential medical information would

31

violate a constitutional right . . . .") (internal quotation marks and citations omitted).

Accordingly, "[w]hen an inmate files suit against prison officials, subsequent release of 'medical records in defense of litigation does not violate any right of the inmate[.]'" Barnes, 2006 WL 2811821, at *3 (citing Woods v. Goord, No. 01-CV-3255 (SAS), 2002 WL 731691, at *11).  Waiver of privacy rights occurs when one places his or her medical condition at issue in a lawsuit.  Id. (citations omitted); Doe, 918 F. Supp. at 585 ("A plaintiff may waive the privilege when his medical condition is at issue in a lawsuit.").

Moreover, such privacy rights can be outweighed by a strong government interest, such as investigation into policies and procedures and marshaling a defense to constitutional claims.  Doe, 918 F. Supp. at 585 ("The right to privacy in one's medical history is a conditional right that may be overcome by the government's interest in having or using the information.") (citations omitted).  Such governmental uses must "advance a substantial state interest" while using the most "narrowly tailored [amount of confidential information] to meet the legitimate interest."  Id. (citations omitted); see also Rodriguez, 287 F. Supp. 2d at 219-20 (upholding Fourteenth Amendment protection where the prisoner "has an unusual medical problem which, if disclosed unnecessarily to other inmates, would likely expose plaintiff to discrimination, intolerance, or potential violence," or where the information "spread through 'humor or gossip.'") (quotations omitted); Webb v. Goldstein, 117 F. Supp. 2d 289, 298-99 (E.D.N.Y. 2000) (dismissing a Fourteenth Amendment claim because the prisoner "has not alleged that his prison records contained the sort of sensitive medical information at issue in . . . Powell.").

In this case, it is clear that Byng's claims directly relate to his medical conditions.  As such, he affirmatively placed the conditions at issue and waived his right to object to any

subsequent release of his records.  See Midalgo v. McLaughlin, No. 9:06-CV-330, 2009 WL

880544, at *2 n.5 (N.D.N.Y. Mar. 3, 2009).  Additionally, to the extent a privacy interest may

still exist, the nature of the lawsuit, which alleges that the State failed to provide necessary

medical treatment for a person in its custody, represents the type of strong and legitimate

penological interest contemplated by the disclosure exceptions.  Moreover, the medical

information was released only to necessary parties, the attorneys defending the respective

individual defendants.  The information was not widely disseminated, and as such, no

unnecessary third parties became privy to the material.

Accordingly, the motion of the CMS defendants as to this claim should be granted.


### F. ADA and RA Claims

Title II of the ADA provides that "no qualified individual with a disability shall, by

reason of such disability, be excluded from participation in or be denied the benefits of . . . a

public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Title

II applies to state inmates.  Docket No. 34; Giraldi v. Bd. of Parole, No. 04-CV-877

(FJS/DRH), 2008 WL 907321, at *5 (N.D.N.Y. Mar. 31, 2008).  To state a claim under the

ADA, an inmate must demonstrate that

> (1) he or she is a "qualified individual with a disability"; (2) he or she is being
> excluded from participation in, or being denied the benefits of some service,
> program, or activity by reason of his or her disability; and (3) [the facility that]
> provides the service, program or activity is a public entity.

Clarkson v. Coughlin, 898 F. Supp. 1019, 1037 (S.D.N.Y. 1995); 42 U.S.C. § 12132.

Similarly, the RA protects any "qualified individual with a disability . . . [from] be[ing]

excluded from the participation in, . . . [or] denied the benefits of," any federally funded

33

program "solely by reason of his or her disability . . . ."  29 U.S.C. § 794(a); <u>see</u> <u>also</u>

<u>Clarkson</u>, 898 F. Supp. at 1037-38 ("The requirements for stating a claim under the ADA

are virtually identical to those under § 504 of the Rehabilitation Act");  <u>Robinson v.</u>

<u>Burlington County Bd. of Soc. Servs.</u>, No. 07-CV-2717 (NLH), 2008 WL 4371765, at *6 (D.

N.J. Sept. 18, 2008) ("Given the similar language in the ADA and RA statutes, the analysis

under the ADA is the same as the analysis under the RA.") (citations omitted).

First, individual defendants cannot be held liable under the ADA or RA.  <u>See</u> <u>Lee v.</u>

<u>City of Syracuse</u>, 603 F. Supp. 2d 417, 448 (N.D.N.Y. 2009) (holding that an individual

cannot be held liable under the ADA); <u>Lane v. Maryhaven Ctr. of Hope</u>, 944 F. Supp. 158,

165 (E.D.N.Y. 1996) (dismissing ADA and RA claims against individual defendant).

Therefore, the action cannot be maintained against Drs. Salzman and Rabinowitz or

Cooper.

Additionally, Byng has failed to identify any programs from which he was excluded

during his incarceration at ACCF.  Instead, he contends that he was prevented from

enrolling in a program to receive hepatitis drug therapy.  Such complaints concerning

medical treatment are insufficient to state a claim under the ADA or RA.  <u>See</u> <u>United States</u>

<u>v. Univ. Hosp.</u>, 729 F. 2d 144, 156-60 (2d Cir. 1984).

Accordingly, the motion of the CMS defendants as to these claims should be granted

in their entirety.


**G. Other Claims**

Byng makes additional claims under various provisions of federal and state law.

Byng claims that his Ninth Amendment rights were violated by the CMS defendants'

conduct.  However, "[n]o independent constitutional protection is recognized which derives from the Ninth Amendment and which may support a § 1983 cause of action."  Rini v. Zwirn, 886 F. Supp. 270, 289-90 (E.D.N.Y. 1995) (citing cases).  Additionally, § 4504 of the New York Civil Practice Law and Rules does not confer a private right of action upon an individual.  Doe v. Community Health Plan-Kaiser Corp., 268 A.D.2d 183, 187 (3d Dep't 2000).  The same is true for § 6509 of the New York Education Law.  MacDonald v. Clinger, 84 A.D.2d 482, 482 (4th Dep't 1982) (holding that CPLR § 4504 and Education Law § 6509 are important evidence of the public policy of New York State "but that there is a more appropriate theory of recovery than one rooted in public policy.").

Furthermore, § 6530 of the New York Education Law sets forth the definitions for professional misconduct and any prosecution based on such definitions is accomplished by the New York State Department of Health.  N.Y. Educ. Law § 6530; N.Y. Pub. Health Law § 230-a.  Similarly, the Public Health Law specifies that the New York Attorney General is vested with the power to bring an action for violations of § 12.  N.Y. Pub. Health Law § 12 (5).  Lastly, identical reasoning holds true for violations of the New York Mental Hygiene Law.  McWilliams v. Catholic Diocese of Rochester, 145 A.D.2d 904, 904-905 (4th Dep't 1988) ("The Mental Hygiene Law is a regulatory statute by which the Commission of the Office of Mental Retardation and Developmental Disabilities is empowered to plan and provide comprehensive services to the State's mentally retarded citizens.  No private cause of action is authorized for violations of the Mental Hygiene Law.")

Accordingly, there is no private right of action for any of these remaining claims and the motion of the CMS defendants should be granted as to all such claims.

35

**III. Motion to Strike**

Byng filed a separate motion pursuant to Fed. R. Civ. P. 12(f) seeking to strike three affidavits, submitted by the County defendants in reply to Byng's response to their motion. Docket No. 194.  Under Fed.R.Civ.P. 12(f), a court may strike "from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." However, motions to strike portions of affidavits or evidence of support thereof are not consistent with the purpose of Rule 12(f).  See Dragon v. I.C. Sys., Inc., 241 F.R.D. 424, 425-26 (D. Conn. 2007).  Such materials are not technically pleadings but "courts have been willing to view motions to strike as calling the propriety of affidavits into question."  Id. (citations omitted).

In this case, the three affidavits in question were submitted in support of the County defendants' reply.  These affidavits  were based on personal knowledge and are probative. In Byng's response, he repeatedly referenced the County defendants' failure to adhere to their own protocol in providing inmates with the facility rules,  which justified Byng's failure to exhaust his administrative remedies.  Given the relevance of the affidavits and their supporting documents to the issues raised by Byng is his pleadings, the County defendants did not improperly submit the supporting papers.

Accordingly, Byng's motion to strike is denied.

**III.  Conclusion**

For the reasons stated above, it is hereby **RECOMMENDED** that:

1. The motion of the CMS defendants for summary judgment (Docket No. 112) be **GRANTED** as to all defendants and all claims and that this action be terminated as to all

36

CMS defendants; and

     2. The motion of the County defendants for summary judgment (Docket No. 125) be:

     A. **DENIED** as to Byng's claim of excessive force against defendants Delong and Rose; and

     B. **GRANTED** in all other respects and that defendants Campbell, and the Albany County Sheriff's Department be terminated from this action; and

     **IT IS ORDERED** that Byng's motion to strike (Docket No. 194) is **DENIED**.

     Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989); 28 U.S.C. §636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated:  October 13, 2009
     Albany, New York

                       David R. Homer
                       U.S. Magistrate Judge